**IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF GEORGIA
MACON DIVISION**

| | |
|---|---|
| **JACQUELINE D. TURNER,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **v.** ) | **CIVIL ACTION NO. 5:10-CV-187(MTT)** |
| ) | |
| **STATE OF GEORGIA SECRETARY OF** ) | |
| **STATE,** *et al.,* ) | |
| ) | |
| **Defendants.** ) | |
| ) | |

## <u>ORDER</u>

This case is before the Court on Defendants' Motion for Summary Judgment. (Docs. 18, 36).  For the following reasons, the Motion is **GRANTED** in part and **DENIED** in part.

## I.  PROCEDURAL HISTORY

On November 30, 2007, after resigning from her job with the Georgia Secretary of State (the SoS), Plaintiff Jacqueline Turner filed a Charge of Discrimination with the Equal Employment Opportunity Commission alleging Defendants Shawn LaGrua and the SoS discriminated against her because of her gender and race.  On February 8, 2010, Turner received her Notice of Right to Sue from the EEOC.  On May 7, Turner filed this action pursuant to 42 U.S.C. §§ 1981, 1983 and 2000c, alleging race and gender discrimination and due process and equal protection violations.

In her amended complaint, Turner asserts against the SoS and Shawn LaGrua, individually, claims for: (1) discrimination on the basis of race and gender because the Defendants failed to promote her to the position of Deputy Inspector General; (2)

discrimination on the basis of race and gender because the Defendants failed to hire her for the position of Investigation Area Supervisor after her position with the SoS was eliminated; (3) disparate treatment; (4) constructive discharge; (5) hostile work environment; and (6) retaliation.

The Defendants have moved for summary judgment on all claims.

## II.  STATEMENT OF FACTS

Jacqueline Turner, an African-American female, was hired in December 2001 as an Investigation Area Supervisor with the SoS Professional Licensing Boards (PLB) division.  On May 13, 2002, Turner became Deputy Director of Enforcement, and then on October 24, 2002, her job title changed to Investigations Assistant Director.  In July 2006, Turner's job title changed again to Director of Investigations.  All of Turner's positions with the SoS were with the PLB division.

### A.    Defendant Shawn LaGrua and Plaintiff Turner's Interactions

In January 2007, Defendant Shawn LaGrua was hired as the Inspector General of the SoS.  LaGrua did not officially become Turner's supervisor until July 2, 2007.  However, LaGrua "began focusing" on the PLB division's operations in late March 2007.  (Doc. 18-2, Def. Stmt. of Undisputed Facts at ¶ 9).

According to Turner, LaGrua "immediately started trying to 'build a case' against [Plaintiff], even though she did not know [Plaintiff] or the quality of [Plaintiff's] job performance."  (Doc. 20-3, Turner Aff. at ¶ 3).  Turner also alleges LaGrua met with her approximately every two weeks "to talk" but "yelled" at her every time, constantly belittled her, kept her out of meetings that affected her job duties, and refused to answer her questions.  (Doc. 31, Turner Amend. Comp. at ¶ 22).  She further contends that

LaGrua yelled at her and slammed shut Turner's office door in the presence of coworkers.  (Doc. 31, Turner Amend. Comp. at ¶ 22).  Rosetta Adams, another SoS employee, confirms that LaGrua yelled at Turner and slammed her office door while "pretty much most of the staff was in the office."  (Doc. 43, Adams Dep. at 25:21-22).

Turner also claims that LaGrua undermined her authority by telling Turner's subordinates that "things [would] change around here when I get my new Chief" (apparently referring to a replacement for Turner), and that they should no longer follow Turner's directions.  (Doc. 31, Turner Amend. Comp. at  ¶ 22).  Turner contends LaGrua eventually stopped communicating with her completely, and that LaGrua told Turner's subordinates to report to LaGrua instead of Turner.  (Doc. 20-3, Turner Aff. at ¶¶ 41, 42).

In addition, Turner alleges that LaGrua "discriminatorily denied" Turner access to training that she needed to keep her POST certification,[1] but that white males were allowed to attend the POST training sessions.  (Doc. 31, Turner Amend. Comp. at ¶ 16).  Further, according to Turner, LaGrua refused to allow her to attend another training conference, even though her acting supervisor, Don Munday, had approved her attendance.  Turner claims LaGrua sent a subordinate, who is a white male, in her place.[2]  (Doc. 20-3, Turner Aff. at ¶ 35).  She also contends LaGrua questioned Turner's leave, but did not question the leave of white employees.  (Doc. 31, Turner Amend.

_____

[1] POST is the acronym for Peace Officer Standards and Training council, which provides training and certifications for peace officers and criminal justice professionals.

[2] One of Turner's allegations states that Ben Pearson was sent in her place. However, emails between LaGrua and Chris Harvey suggest that Lynn Eason, a black male, may have gone in Turner's place.  The record is not clear who actually attended the conference, nor is it relevant to the Court's analysis.

Comp. at ¶ 17).  Moreover, Turner argues that she had received "exceeds expectations" reviews on performance evaluations prior to LaGrua's hire and had never been formally reprimanded, even by LaGrua.  Although LaGrua did insist on inserting comments in Turner's last performance evaluation, LaGrua's comments did not affect the outcome of Turner's last performance evaluation.  That evaluation qualified Turner for a "performance based" pay increase.

LaGrua contends that all her actions resulted from her concerns regarding Turner's job performance, specifically: (1) Turner's failure to monitor the use of gas cards by her subordinates; (2) Turner's supervision of a particular worker and uneven case distribution; (3) Turner's lack of accrued leave time; (4) Turner's decision to allow an investigator to work alone at night; and, (5) an unnecessary special operation planned by Turner.  (Doc. 18-2, Def. Stmt. of Undisputed Facts at ¶ 11).  With the exception of (3) and (4), these alleged concerns, plus one other, are the Defendants' legitimate nondiscriminatory reasons for failing to promote Turner.  Defendants do not argue Turner's failure to accrue leave time and allowing an investigator to work at night were sufficient reasons not to promote Turner.

### B.    The Savannah Operation

The principal basis for LaGrua's concern with Turner was a special operation Turner said she began planning before the SoS hired LaGrua.  According to Munday, in the middle of May 2007, Turner discussed with him the need to plan a confidential used car dealer inspection in the Savannah area.  Turner told Munday that there were numerous problems in the Savannah area and that there had not been an inspection of the used car dealers in that area.  Based on this information, Munday told Turner to plan

a suitable operation.  Turner assembled a team, secured hotel reservations in Savannah, and made other plans related to the operation.

A few weeks later, LaGrua asked Munday if he was familiar with the Savannah operation and the reasons Turner had planned the operation.  LaGrua told Munday that Turner had not told her about the Savannah operation, and that she learned of the operation through Turner's subordinates.  LaGrua expressed concern to Munday about the operation and the resources it would entail, but asked him not to speak to Turner about her concerns.

On June 4, 2007, LaGrua spoke to Turner about the Savannah operation and told Turner the operation was a bad idea.  According to Turner, LaGrua yelled at her and accused her of using bad judgment in planning the Savannah operation in front of other coworkers.  (Doc. 20-3, Turner Aff. at ¶ 39).  Turner contends that she was the only person LaGrua was "belittling" regarding the special operation and that LaGrua was not her supervisor at the time.  (Doc. 18-18, Turner Dep. at 48-49).  Turner further alleges that LaGrua "accosted" her two or three times more regarding the Savannah operation.  (Doc. 18-18, Turner Dep. at 50:4-8).

LaGrua denies that there were complaints in the Savannah area regarding used car sales, and points to an email that Turner sent her regarding used car sales complaints as the basis for her belief.  The email listed several counties, all in the Atlanta area with the exception of Bibb County, along with the number of complaints in each listed county.  LaGrua contends that the email is proof that there were no complaints in the Savannah area.  (Doc. 18-5 at 11; Doc. 18-9, LaGrua Dep. at 38:19-25).

Turner responds that it is clear from the face of her email that it had no relevance to Savannah.  The reason the email did not contain any complaints from Savannah was, because, "[i]n an effort to support [LaGrua's] desire to focus on the Metro Atlanta area, [Turner] compiled data showing complaints in [those] areas."  Turner alleges that Savannah is a neglected area of the state, that "[t]here may have been 91 complaints in Savannah at the time the operation was planned," and that there had been previous operations in the other areas with a high number of complaints.  (Doc. 20-3, Turner Aff. at ¶ 36).  Further, Rosetta Adams testified that several complaints were logged in the computer regarding the Savannah/Chatham County area, and that the PLB had already constructed a similar operation in the Decatur/DeKalb area before LaGrua was hired by the SoS.  (Doc. 43, Adams Dep. at 53-54).  LaGrua subsequently cancelled the special operation in Savannah.

### C.     The Deputy Inspector General Position

On June 7, 2007, the SoS advertised for the position of Deputy Inspector General (Deputy IG).  Turner applied for the position, and she contends she was the most qualified candidate because the position description was essentially identical to the duties of the position she held at the time, Director of Investigations/Deputy Director of Enforcement.  Turner admits that the Deputy IG position included the responsibility of overseeing all SoS divisions, while Turner's current position was limited to oversight of the PLB.  (Doc. 18-18, Turner Dep. at 65-66).  However, a comparison of the job descriptions for Turner's job and the Deputy IG position confirms a significant overlap between the two positions.

Turner was not granted an interview.  (Doc. 20-3, Turner Aff. at ¶ 20).  The Defendants do not dispute that Turner met the qualifications for the position.  These requirements included a four year degree in accounting, criminal justice, or business; five years of extensive supervisory, law enforcement and administrative experience; and POST Enforcement certifications.  Turner has a Bachelor's Degree in Organizational Management, an Executive MBA in Management, and she was a doctoral student in Management at the time she applied for the Deputy IG position.  Turner also had twelve years of supervisory experience, including five years with the SoS.

However, on August 1, William C. Harvey, a white male who Turner alleges had less experience and education than she, was selected for the Deputy IG position.  (Doc. 31, Turner Amend. Comp. at ¶¶ 11,12).  Harvey had been the director of a cold case investigations team for two and a half years, an investigator for a district attorney's office, and a police officer/homicide investigator for a police department before being hired as the SoS Deputy IG.   Harvey did not have any experience within the SoS, and Turner alleges that Harvey may not have even met the minimal qualifications for the supervisory experience requirement of the Deputy IG position.  In any event, she alleges he was much less qualified than she.

In the Defendants' Motion, they assert three legitimate nondiscriminatory reasons for not hiring Turner for the position.  (See *infra* section 3.1.b.).  However, SoS records, which the Defendants do not address, specifies different reasons:  Turner "was not considered for the position due to poor communication skills demonstrated in her resume and sample writing."  (Doc. 24-2 at 4).  Turner asserts "[n]o 'writing sample' was

ever produced in conjunction with the application process for [the Deputy IG] job."  (Doc. 37 at 7).

### D.    Turner's Grievance

On September 7, 2007, Turner sent an informal grievance letter to Doris Parker, the head of the SoS Human Resources office, and Mary Douglas, another Human Resources officer.  (Doc. 18-12).  Turner informed them that she could no longer handle LaGrua's "harassment" and stated she believed she was the "victim of workplace bullying []" by LaGrua.  She felt that LaGrua's most recent action—the rescission of Turner's approval for training and sending a subordinate in her place—was "done out of retaliation" against Turner because she expressed her concerns about LaGrua's management style.  Turner stated she was "truly fearful" every time LaGrua spoke with her.  Turner further elaborated on other incidents regarding Turner's leave, LaGrua's lack of communication, and the lack of subordinates reporting to Turner.  Turner also discussed her recent visits to the doctor's office to obtain medicine for job-related stress as a result of her confrontations with LaGrua.  (Doc. 18-12).

On September 11, 2007, Turner filed an official grievance pursuant to the SoS's Grievance Policy.  (Pl. Ex. 3).  Turner raised five issues: "(1) verbal abuse (accusatory attacks without first obtaining verification), (2) humiliating and offensive actions, (3) work interference (via email – documented proof), (4) hostile work environment, (5) workplace bullying (harassment)."  She requested "[c]larification of my job duties under the new administration; a work environment conducive to positive productivity," and "a different direct report—i.e. directly to W. Chris Harvey—someone who knows how to manage and supervise law enforcement personnel."  (Doc. 18-13 at 2).

Unbeknownst to Turner, on September 10, according to a memorandum written by LaGrua, LaGrua and Harvey met with Doris Parker to discuss various employees. (Pl. Ex. 7).  During that meeting, they asked Parker whether they needed to give Turner a specific written reason if LaGrua chose to demote her.  When Parker realized that LaGrua intended to demote Turner, she told LaGrua that Turner could file an EEOC complaint directly against LaGrua because Turner was African-American.  It appeared to LaGrua that Parker was siding with Turner.  Consequently, LaGrua then met with Minuard McGuire[3] about her concerns and the earlier meeting with Parker.  On September 11, LaGrua drafted a letter demoting Turner, but Mary Douglas stopped LaGrua from actually sending the demotion letter because, by then, Turner had filed her official grievance.  (Doc. 18-14 at 4).

On October 15, Turner received a letter from McGuire informing her that her claim was a non-grievable issue.  The grievance policy defines grievance as "a claim by any eligible employee that the employee's personal employment has been affected by an unfavorable employment decision or condition due to unfair treatment."  McGuire has not been able to provide Turner with any notes regarding his denial of her grievance.

### E.   The Reorganization of the SoS and the Investigation Area Supervisor Positions

Turner alleges her job was eliminated through "what was falsely called a 'reorganization.'" (Doc. 31, Turner Amend. Comp. at ¶ 14).  The Defendants contend that in May 2007 the formal process of realigning the Investigations Division to fall under the purview of the Inspector General's Office began.  (Def. Stmt. of Undisputed Facts at

---

[3] McGuire's positions at the time of the incident were Director of Budget and Capital Projects and Acting Director of Administration.  There is no evidence he had human resources or personnel responsibilities and it is not clear how he came to be involved.

¶ 20).  The reorganization would put all SoS investigators under the Inspector General's office and cross-train the investigators to investigate any type of complaint.  (Doc. 18-5, LaGrua Aff. at ¶ 3).  Turner does not claim to have been unaware of the reorganization. She does claim, however, that she was not informed of the effect the reorganization would have on her position until October 19, 2007.  (Doc. 20-3, Turner Aff. at ¶ 7).  In fact, Turner states LaGrua initially told her that she had nothing to worry about with regard to her position.

On October 19, LaGrua, along with Harvey (who, by this time, had been hired instead of Turner for the Deputy IG position) and Munday, met alone with Turner (they met with other affected employees as a group) to explain the reorganization plan and told her she would have to apply for one of two Investigation Area Supervisor (IAS) positions because her current position was being eliminated.  Turner was initially hired as an IAS in 2001, and had been promoted to various positions since.  In her eliminated position, Turner supervised IASs.  Thus, the IAS position would technically be a demotion for Turner.  Turner alleges only two positions were eliminated in the reorganization and that both positions were held by black females, Turner and Annie Plummer, a Cosmetology Inspector.

Following the elimination of those positions, the SoS posted the Investigation Area Supervisor positions and allowed any current qualified employee of the SoS to apply for the positions.  On October 31, LaGrua and Harvey interviewed candidates, including Turner, Lynn Eason, and Ben Pearson.  Eason had a high school diploma, had previously worked for the Bibb County Sheriff's Office for twenty-six years, and had been an SoS Investigation Area Supervisor/Investigator since May 2006.  Ben Pearson

was enrolled in Florida Metropolitan University[4], had worked for the Douglas County and Bleckley County Sheriffs' Offices, and had been a PLB Regulatory Agent[5] since July 2006.  As noted, Turner has a Bachelor's Degree in Organizational Management, an Executive MBA in Management, and she was a doctoral student in Management at the time she applied for the IAS position.  Turner also had twelve years of supervisory experience, including five years with the SoS.

According to SoS documents, LaGrua and Harvey discussed ways to rank candidates and ultimately determined that they would denote certain areas of qualifications as "critical" and give those "critical" areas more weight when determining which candidates to hire for the supervisory positions.  In a memorandum, Harvey provides a detailed summary of the IAS interview process, but makes no reference to Turner specifically.  According to Harvey's memorandum, he and LaGrua were told to ask all candidates the same questions and to make the process as standardized as possible.  Harvey prepared the interview questions and created a scoring scale with a description of what each score indicated.  Candidates were then ranked on their answers to his questions.  After the interviews, LaGrua and Harvey had scores for each candidate, and decided that they would address twelve areas of interest (the only two areas listed in the memo are "Supervisory Experience" and "Quality of Supervisory Experience").  They further decided to give different areas relative values.  Harvey's memorandum indicates that he and LaGrua relied on experience and qualifications in making their determination.  Eventually, they scored each candidate, and according to

---

[4] Now Everest University, a for-profit school.

[5] A Regulatory Agent is a non-supervisory position within the SoS.

the memorandum, neither had Turner in the top four, despite her experience and qualifications.

Harvey then gave Cathy Sterling, a Human Resources employee, copies of the summary of the process and other materials.  Sterling requested the notes taken during the interviews and the evaluation forms for each candidate.  According to Harvey's memorandum, LaGrua conferred with others and "it was determined that the original notes [and presumably the evaluation forms] should not be included in the packet we turned in."  (Doc. 21-6).

LaGrua and Harvey chose to hire Lynn Eason and Ben Pearson.  However, before announcing their decision, they met with Rob Simms, Minuard McGuire, and Wes Tailor.[6]  At this meeting, Tailor said, presumably in reference to Turner filing an EEOC/Title VII complaint, "if she is going to file, she's going to file."  On November 29, LaGrua told Turner she had not been chosen for an Investigation Area Supervisor position, but offered her a non-supervisory Regulatory Agent position, a position subordinate to any position Turner had ever held at the SoS, but with no decrease in salary.

In support of their Motion, the Defendants assert four legitimate nondiscriminatory reasons for not selecting Turner for an IAS position.  (See *infra* section 3.1.c.).  In her deposition, LaGrua stated Turner was not hired because "she was not the most qualified for that position," and that the job was given to "other more qualified folks."  (Doc. 18-9, LaGrua Dep. at 14).  SoS records, which the Defendants again do not mention, state Turner was not hired because she had "had poor

---

[6] Simms, McGuire, and Tailor were, at the time, directors of different SoS divisions.

communication skills demonstrated in resume and interview; lack of supervisory experience." (Doc. 24-2 at 4).

Turner claims the Regulatory Agent position would force her to be supervised by people who were previously her subordinates, and that she was more qualified than either of the men hired for the Investigation Area Supervisor positions. (Doc. 31, Turner Amend. Comp. at ¶ 21). On November 30, Turner, after refusing to take a Regulatory Agent position, resigned from the SoS and filed her EEOC complaint.

## III. Discussion

### A.    Summary Judgment Standard

Summary judgment must be granted if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material facts and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). "A factual dispute is genuine only if 'a reasonable jury could return a verdict for the nonmoving party.'" *Info. Sys. & Networks Corp. v. City of Atlanta*, 281 F.3d 1220, 1224 (11th Cir. 2002) (quoting *United States v. Four Parcels of Real Prop.*, 941 F.2d 1428, 1437 (11th Cir. 1991)). Further, the burden rests with the moving party to prove that no genuine issue of material fact exists. *Info Sys. & Networks Corp.*, 281 F.3d at 1224. The district court must "view all evidence in the light most favorable to the nonmoving party, and resolve all reasonable doubts about the facts in its favor." *Id.*

### B.    Section 1983 Claims Against Defendant Shawn LaGrua

LaGrua contends that she is protected from suit in her individual capacity by qualified immunity. Qualified immunity protects government officials sued in their individual capacities so long as their conduct was discretionary and does not "'violate

clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Vinyard v. Wilson*, 311 F.3d 1340, 1346 (11th Cir. 2002) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1983)).

The threshold determination in qualified immunity analysis is whether the official was acting within the scope of her discretionary authority when the alleged constitutional violation occurred. *Case v. Eslinger*, 555 F.3d 1317, 1325 (11th Cir. 2009). In making this determination, the relevant consideration is whether the acts of the official were "of a type that fell within the employee's job responsibilities." *Holloman ex. Rel. Holloman v. Harland*, 370 F.3d 1252, 1265 (11th Cir. 2004). Further, "an official performs a discretionary function when his acts but for the constitutional infirmity, would have fallen within his legitimate job description, and the acts were done through means that were within his power to utilize." *Id.* at 1266.

Here, LaGrua was performing discretionary functions within the scope of her position as the SoS Inspector General at all times relevant to Turner's allegations against her. All of Turner's claims against LaGrua arise from LaGrua's refusals to hire Turner as the Deputy IG or as an IAS and LaGrua's alleged treatment and harassment of Turner while Turner was working for the SoS. Because LaGrua, as the Inspector General, had the responsibility to make promotion and hiring decisions, supervise Turner, and make business decisions affecting the SoS in general, LaGrua's actions against Turner are discretionary functions.

"Once discretionary authority is established, the burden then shifts to the plaintiff to show that qualified immunity should not apply." *Lewis v. City of West Palm Beach*, 561 F.3d 1288, 1291 (11th Cir. 2009). The Supreme Court has set forth a two-step

process for resolving qualified immunity claims.  *Saucier v. Katz*, 533 U.S. 194, 201 (2001).[7]  The first step is to "determine [] whether the [defendant's] conduct amounted to a constitutional violation."  *Lewis*, 561 F.3d at 1291.  The second step is to determine "whether the right violated was 'clearly established' at the time of the violation."  *Id.* (quoting *Saucier*, 533 U.S. at 201).  The second factor does not require that the act be actually unlawful, but that, "in light of preexisting law the unlawfulness must be apparent."  *Anderson v. Creighton*, 483 U.S. 635, 640 (1987).

Here, Turner alleges that LaGrua has violated her "right to due process and equal protection under the Fourteenth Amendment."  Turner can only bring § 1983 and § 1981 claims against LaGrua, individually, and specifically alleges in the complaint, that she was denied her right to be free from race and gender discrimination; she was retaliated against; she had to endure a hostile work environment; and that she was constructively discharged.

Although Turner alleges that her constitutional rights were violated, she fails to establish that LaGrua's actions violated a *clearly established constitutional right*.  Turner offers no evidence that federal law, Eleventh Circuit case law, or United States Supreme Court case law clearly prohibited LaGrua's specific actions.  Although LaGrua's actions, as alleged by Turner, were harassing, unprofessional, and potentially subject to Title VII liability, there is no evidence that LaGrua acted outside the scope for which is protected by qualified immunity, *i.e.*, that her actions' unlawfulness was

---

[7] Overruled on other grounds by *Pearson v. Callahan*, 555 U.S. 223, 236 (2009) (holding that while *Saucier v. Katz*'s two-step test was helpful for resolving qualified immunity claims, courts may exercise their discretion in deciding which of the two prongs should be addressed first in light of circumstances particular to the case at hand).

objectively clear and apparent.  Accordingly, LaGrua is entitled to qualified immunity on all Turner's § 1983 and § 1981 claims.

### C.    Claims against the Georgia Secretary of State

#### 1.    Failure to Promote Claims

##### a.    Generally

Turner relies on circumstantial evidence and the framework for analyzing circumstantial evidence first applied in *McDonnell Douglas Corp. v.* Green, 411 U.S. 792 (1973), to establish a prima facie case of discrimination.  With regard to a failure to promote claim, a plaintiff must establish that "(1) she is a member of a protected class; (2) she was qualified and applied for the promotion [or position]; (3) she was not promoted; and (4) someone outside her protected class was promoted."  *Walker v. Mortham*, 158 F.3d 1177, 1186 (11th Cir. 1998).  If a plaintiff establishes a prima facie case of discrimination, the burden of production, but not the burden of persuasion, shifts to the employer to articulate a legitimate, nondiscriminatory reason for the employment action.  *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 254-55 (1981).

The burden then returns to the plaintiff to prove that the employer's reasons are a pretext for discrimination.  *Id.* at 253.  The employee can meet this burden "either directly by persuading the court that a discriminatory reason more likely motivated the employer *or* indirectly by showing that the employer's proffered explanation is unworthy of credence."  *Id.* at 256; *Combs v. Plantation Patterns*, 106 F.3d 1519, 1528 (11th Cir. 1997) (emphasis added).[8]  If the proffered reason is one that might have motivated a

---

[8] There is some confusion regarding a plaintiff's burden to prove pretext.  Citing *St. Mary's Honor Center v. Hicks,* 509 U.S. 502 (1993), some cases suggest that a plaintiff responding to an employer's motion for summary judgment must prove that the employer's legitimate, nondiscriminatory reason is false *and* that discrimination was the real reason for the employer's

reasonable employer, the employee "must meet that reason head on and rebut it, and

the employee cannot succeed by simply quarreling with the wisdom of that reason."

*Chapman v. AI Transport,* 229 F.3d 1012, 1030 (11th Cir. 2000).  If a defendant

articulates more than one legitimate, nondiscriminatory reason, the plaintiff must rebut

each of the reasons to survive summary judgment.  *Id.* at 1037.  Thus, "[a] plaintiff

withstands summary adjudication by producing sufficient evidence to allow a reasonable

finder of fact to conclude that the defendant's articulated reasons for its decision are not

believable."  *Howard v. B.P. Oil Co., Inc.*, 32 F.3d 520, 526 (11th Cir. 1994).

  If a plaintiff rests *solely* on her superior qualifications, she cannot simply show

that she was better qualified than the individual who was hired instead of her.  *Lee v.*

*GTE Florida, Inc.*, 226 F.3d 1249, 1253 (11th Cir. 2000).  However, evidence that an

---

action.  *See Upshaw v. Ford Motor Co.*, 576 F.3d 576, 587 (6th Cir. 2009); *Maxfield v. Cintas Corp. No. 2,* 427 F.3d 544, 550-51 (8th Cir. 2005).  However, the Supreme Court in *St. Mary's* did not address a plaintiff's burden at the summary judgment stage.  Rather, the Court addressed whether an employee is entitled to judgment as a matter of law when the factfinder has concluded that the employer's nondiscriminatory reason is false, but nevertheless found that the employer did not intentionally discriminate against the plaintiff.  Moreover, as noted by Judge Wilson in his concurring opinion in *Convoy v. Abraham Chevrolet-Tampa, Inc.,* 375 F.3d 1228, 1236 (11th Cir. 2004), the Supreme Court in *St. Mary's* "flatly rejected the so-called 'pretext-plus' approach to discrimination analysis, which had required the plaintiff not only to demonstrate that the employer's asserted reasons were pretextual, but also to introduce additional evidence of discrimination."  In *Reeves v. Sanderson Plumbing Products, Inc.,* 530 U.S. 133 (2000), the Supreme Court disposed of any lingering viability of pretext-plus analysis. While it is true the plaintiff must ultimately prove intentional discrimination, "it is *permissible* for the trier of fact to infer the ultimate fact of discrimination from the falsity of the employer's explanation."  *Id.* at 147 (emphasis in original).  In a concurring opinion, Justice Ginsburg, in a summary of the majority's holding, wrote that a plaintiff "*may* survive judgment as a matter of law by submitting two categories of evidence:  first, evidence establishing a 'prima facie case,' …; and second, evidence from which a rational factfinder could conclude that the employer's proffered explanation for its actions was false."  *Id.* at 154 (emphasis in original); *see also Dulin v. Bd. of Com'rs of Greenwood Leflore Hosp.*, 657 F.3d 251 (5th Cir. 2011).  Clearly, at the summary judgment stage, the plaintiff, in rebutting the employer's proffered legitimate, nondiscriminatory reason, does not shoulder the burden of producing evidence both of falsity and that the real reason was discrimination.  Indeed, the *McDonnell Douglas* test is all about proving intentional discrimination by circumstantial evidence; if the employee had direct evidence that the real reason for the adverse employment action was discrimination, the employee would have no need to resort to the *McDonnell Douglas* test.

employer hired a less qualified applicant over a plaintiff may be probative of whether the employer's proffered reason for not promoting the plaintiff was, in fact, pretextual. *Id.* Further, in some cases, evidence of a plaintiff's superior experience "would permit a jury to disbelieve" that the employer actually relied on the chosen candidate's experience when making the hiring decision. *Taylor v. Runyon*, 175 F.3d 861, 868 (11th Cir. 1999). But if a plaintiff alleges disparity in qualification *alone* to establish pretext, the disparity must be "so superior as to allow a reasonable fact finder to conclude" that the employer's reason for not hiring the plaintiff was pretextual, or the disparity in qualifications should be so significant that no reasonable person in the exercise of impartial judgment could choose the selected candidate over the plaintiff for the job. *Cofield v. Goldkist, Inc.*, 267 F.3d 1264, 1268 (11th Cir. 2001); *Licausi v. Symantec Corp.*, 2009 WL 1873663, *11 (S.D. Fla. 2009).

Moreover, "an employer's failure to articulate clearly and consistently the reason for an employee's discharge may serve as evidence of pretext." *Hurlbert v. St. Mary's Health Care Sys., Inc.,* 439 F.3d 1286, 1299 (11th Cir. 2006); *Cleveland v. Home Shopping Network, Inc.,* 369 F.3d 1189, 1194 (11th Cir. 2004); *Bechtel Const. Co. v. Sec't of Labor,* 50 F.3d 926, 935 (11th Cir. 1995). An employer is permitted, however, to elaborate on its reasons for taking an employment action. *See Standard v. A.B.E.L. Services, Inc.,* 161 F.3d 1318, 1332 (11th Cir. 1998) (indicating that a more detailed explanation for a general reason is insufficient to establish pretext). Also, an additional, but previously undisclosed, reason for an employment decision does not itself establish pretext. *Tidwell v. Carter Prods.,* 135 F.3d 1422, 1428 (11th Cir.1998) (citing *Zaben v. Air Prods. & Chem., Inc.,* 129 F.3d 1453, 1458–59 (11th Cir.1997)). However,

discrepancies and inconsistencies may cast doubt on a defendant's credibility. *Chapman*, 229 F.3d at 1058.

Thus, to survive summary judgment a plaintiff must offer sufficient evidence to create an issue of material fact about whether the employer's stated reasons are pretextual. *Id.* at 1025.

### b. Deputy Inspector General Position

On June 7, 2007, the SoS advertised for the position of Deputy Inspector General. Turner applied for the position but was not granted an interview. Instead, William C. Harvey, a white male, was hired. The Defendants admit that Turner can establish a *McDonnell Douglas* prima facie case for race and gender discrimination for the failure to promote Turner to the Deputy IG position.

The Defendants assert three legitimate nondiscriminatory reasons for failing to promote Turner to the Deputy IG position: (1) that Turner had not taken steps to ensure that gas cards were being used properly; (2) that Turner unevenly distributed cases to particular investigators; and (3) that Turner had planned a special operation in Savannah even though there were no complaints regarding used car dealerships.

First, the Court notes that these reasons appear to be after the fact justifications for the Defendants' refusal to consider Turner for the Deputy IG position. SoS records state that Turner was not promoted because of "poor communication skills demonstrated in her resume and sample writing" and make no mention of any of the reasons stated above. However, Turner claims that she did not submit a writing sample when she applied for the Deputy IG position. The record supports Turner's contention; the SoS Deputy IG job posting does not ask applicants to submit a writing sample.

(Doc. 18-22 at 6-7). These inconsistencies, by themselves, are perhaps not sufficient to establish pretext.  However, the fact that the Defendants' legitimate nondiscriminatory reasons differ from the reasons documented in SoS records cast doubt on the truthfulness of the reasons now advanced by the Defendants.

With regard to the Defendants' asserted legitimate nondiscriminatory reasons, Turner claims each is pretextual.  With regard to the gas cards, Munday testified there was no evidence that Turner had not questioned the possible misuse of gas cards, but LaGrua "just wanted to make sure that Jackie knew that that was something that she should question when it comes up."  (Doc. 18-10, Munday Dep. at 22:11).  When LaGrua spoke to Turner, Turner explained that keeping up with the gas cards was not her responsibility; such matters were the responsibility of Rosetta Adams, who was the vehicle coordinator.  (Doc. 20-3, Turner Aff. at ¶ 38).  According to Munday, this issue would not, and did not, affect Turner's performance evaluation, an evaluation in which LaGrua participated.  (Doc. 18-10, Munday Dep. 22).  Thus, there is evidence that gas card usage was not Turner's responsibility and that LaGrua knew this.  Even if it were Turner's responsibility, the evidence tends to show this was a minor issue that had been addressed.  Thus, Turner has presented sufficient evidence to allow a reasonable juror to conclude that this articulated reason is unworthy of credence.

Second, LaGrua complains that Turner did not distribute cases evenly to her investigators, citing one particular investigator, L.D. Moore.  First, it should be noted that the Defendants offered no actual evidence of this uneven caseload distribution, but instead rely on LaGrua's testimony and a vague statement she placed in Turner's evaluation.  LaGrua noted that "Jackie was counseled on the agency desired strategy

for case load," a notation that also did not affect the outcome of the evaluation. (Doc. 18-26 at 5). Turner responded to LaGrua's notation on her evaluation very specifically, by writing, "the Agent in question was assigned 60 cases this evaluation period; turned in 50 cases which equated to 83% of his expectations; ranked #5 of 7 in his unit by completing 11.6% of the 431 cases completed by his unit; increased his productivity 78% from 17 completed cases during 7/1/06-12/31/06 to 40 cases completed during 1/1/07-6/30/07, while performing other duties as outlined in his performance…. According to his FY'07 end of the year file review he had 24 cases assigned to him. 3 other agents were carrying over 40. 2 other agents carried 26 cases and one newly hired agent was carrying 13 cases at the end of this evaluation period." (Doc. 18-26 at 11). Turner also stated that when she started assigning cases in March 2007, she "held a meeting on March 19, 2007 to reassess and reassign current caseloads, which the IG [LaGrua] attended. On 6/29/07, [she] sent the IG a proposed outline for case management realignment and [LaGrua] responded that she wanted to wait and allow the Investigators to have input before we instituted any major changes." (Doc. 18-26 at 11). According to Turner, LaGrua did not respond any further to her proposed case management outline. The Court concludes that Turner has presented sufficient evidence to conclude that this reason is unworthy of credence.

Finally, the Defendants point to, and rely heavily on, the cancelled Savannah special operation. According to LaGrua, "the Savannah incident showed a serious lapse in Ms. Turner's judgment that made her an unacceptable choice for the Deputy IG position." (Doc. 18-5, LaGrua Aff. at 6). Defendants' evidence consists of an email from Turner to LaGrua which they claim demonstrates that there were no complaints at

all in Savannah.  Turner responds out that the email only addressed complaints in particular areas, areas that LaGrua asked Turner to focus on:  "When I ran the number reflected in [the email], I gave her statistics on the area Defendant LaGrua [had] asked for."  (Doc. 20-3, Turner Aff. at ¶ 6).  Thus, Turner argues that LaGrua knew, or should have known, that the email only included complaints from certain areas.  The content of the email supports Turner's contention.  The only counties discussed in the email are those in the Atlanta area and Bibb County.  Moreover, Turner testified, "[t]here may have been 91 complaints in Savannah at the time the operation was planned."  (Doc. 20-3, Turner Aff. at ¶ 36).  Rosetta Adams also testified that several complaints were logged in the computer regarding the Savannah/Chatham County area.  (Doc. 43, Adams Dep. 53-54).  Turner has presented sufficient evidence to allow a reasonable juror to conclude this articulated reason for the Defendants' decision is not believable.

Turner's superior qualifications for the job, although not dispositive on their own, support the conclusion that a reasonable jury could believe that LaGrua's stated reasons for refusing to grant Turner an interview for the Deputy IG position were a pretext for discrimination.  LaGrua argues that Harvey "was the most qualified candidate based upon experience and … interview."  (Doc. 18-5, LaGrua Aff. at ¶ 5).  The evidence tends to show otherwise.  Turner has a Bachelor Degree in Organizational Management, an Executive MBA in Management, and she was a doctoral student in Management at the time she applied for the Deputy IG position.  Turner also had twelve years of supervisory experience, including five years with the SoS.

Harvey had no experience within the SoS.  He had been the director of a cold case investigations team for a local law enforcement agency for two and a half years,

an investigator for a district attorney's office, and a police officer/homicide investigator for a police department before being hired by the SoS for the Deputy IG position. The disparity in Turner's and Harvey's respective qualifications, in the Court's view, is significant.

Accordingly, with regard to Turner's failure to promote to Deputy IG claim, summary judgment is denied.

### c.    Investigation Area Supervisor Position

The Defendants also admit that Turner can establish a prima facie case for race and gender discrimination for their failure to promote/hire Turner to the Investigation Area Supervisor position.[9]  In response, the Defendants offer the same three reasons they claim Turner was not promoted to the Deputy IG position, plus one additional reason.  The additional reason is that LaGrua claims Turner called her a "bitch." Specifically, LaGrua alleges that she was told that Turner said "every time that bitch comes down [to Macon], I put her in her place."  (Doc. 18-9, LaGrua Dep. at 51:24).

First, the Court again notes that these reasons seem to be after the fact justifications for the refusal to hire Turner for the IAS position.  SoS records state Turner was not promoted because of "poor communication skills demonstrated in her resume and interview; lacks depth of supervisory experience."[10]  In addition, Harvey's detailed

---

[9] Although Lynn Eason, one of the males hired instead of Turner, is black, the Defendants concede Turner can establish a prima facie case of race discrimination because Turner would have only been hired for one of the positions and one of the positions was filled by a white male.

[10] Perhaps the Defendants chose not to stand by the reason asserted by the SoS record – "lacks depth of supervisory experience" – because that almost certainly was not the case. Turner had twelve years of supervisory experience, five of which were with the SoS.  Turner had been an IAS and had, after being promoted, supervised other IASs.  Eason had one year of supervisory experience with the SoS, and Pearson had no supervisory experience with the SoS. Indeed, according to Harvey's memorandum, Turner did not even rank among the top four

memorandum of the application and interview process makes no mention of the reasons now advanced by the Defendants, but rather describes a meticulous ranking system based on answers to uniform questions.

In this regard, it is troubling to the Court that LaGrua and Harvey, after designing an elaborate interview process, refused the Human Resources officer's request for their notes and scoring sheets. Assuming an honest process, the true reasons for rejecting Turner should be found in those notes and scoring sheets. On the basis of the record before the Court, the Court cannot say whether the Defendants have spoliated evidence. At the very least, however, it is apparent that the reasons now advanced by the Defendants conflict with SoS records. Again, these inconsistencies, by themselves, are perhaps not sufficient to establish pretext. However, the fact that, for the second time, the legitimate nondiscriminatory reasons offered by the Defendants differ from those reasons documented in SoS records, in conjunction with other evidence, casts doubts on the truthfulness of the reasons now advanced by the Defendants.

With regard to those reasons, as noted, the first three are the same reasons given for not interviewing Turner for the Deputy IG position. The analysis for those three reasons is identical for the IAS position. For the reasons set forth above, Turner has come forward with sufficient evidence tending to show that these reasons are unworthy of belief and that a reasonable jury could find that they are pretext for discrimination.

---

candidates for the two positions. Whatever the reasons that Turner was not promoted; it seems highly improbable that her relative lack of supervisory experience could be one of those reasons. If the Court had the benefit of the interview notes and scoring sheets, perhaps those reasons would be apparent.

The fourth reason, that Turner allegedly called LaGrua a bitch, requires more discussion.  The Court must look to whether LaGrua subjectively believed that this comment was made at the time she did not hire Turner for the IAS position.  LaGrua claims that Ben Pearson and Lynn Eason, the two people eventually hired for the IAS positions, told her about this comment in late August 2007 after LaGrua and Harvey left the Macon office following a discussion with Turner.  Turner denies making the comment.  Rosetta Adams testified that she never heard Turner make the comment.  LaGrua admits that she never asked Turner about it, nor did she reprimand, suspend, or discipline Turner regarding the comment.

However, in a memo dated August 30, 2007, titled "Discussion with Mickey McGuire and Frank Heiney," LaGrua writes that Ben Pearson told her about the "bitch" comment, and that another supervisor, Lynn Eason, also heard Turner use the word while passing her office, although he was not present the entire time.  (Doc. 18-16 at 5).

In general, a supervisor's belief that an employee called her a bitch certainly could be legitimate nondiscriminatory reason to not promote or hire the employee.  However, the facts here cast doubt on whether this was actually one of the reasons Turner was not hired for the IAS position.  Turner applied for the IAS position following the elimination of her position on October 25, 2007, almost two months after the alleged incident.  Notwithstanding the alleged name calling (plus other reasons now advanced by the Defendants), Turner was chosen to be interviewed for the position, and was interviewed by LaGrua and Harvey at the end of October.

As noted, Harvey's detailed memorandum makes no mention of any of these four reasons for not promoting Turner.  Further, if anything is clear from the record, it is clear

that LaGrua was not reluctant to confront Turner regarding any number of incidents, many of which seem much less significant.  LaGrua's inaction, and for the most part, silence, regarding the alleged comment offers additional support for Turner's contention that this reason lacks credence.  Accordingly, the Court concludes Turner has established that a reasonable juror could conclude that the Defendants' fourth reason for not promoting Turner to the IAS position is not credible.

Finally, it is significant that LaGrua, in her deposition, took a somewhat different position and argued that Turner was not promoted because "she was not the most qualified for that position," and that the job was given to "other more qualified folks." (Doc. 18-9, LaGrua Dep. at 14).  The evidence tends to show otherwise.  The Court has already detailed Turner's qualifications.   At the time of the hiring process, Eason had a high school diploma, had previously worked in the Bibb County Sheriff's Office for twenty-six years, and had been an SoS Investigation Area Supervisor/Investigator since May 2006.  Ben Pearson was enrolled in Florida Metropolitan University, had worked at the Douglas County and Bleckley County Sheriffs' Offices for several years, and had been an SoS PLB Regulatory Agent, a non-supervisory position, since July 2006. Indeed, this likely is an example of disparity in qualifications "so apparent as virtually to jump off the page and slap you in the face."  *Ash v Tyson Foods, Inc.,* 546 U.S. 454, 456-457 (2006).[11]  These disparities are not dispositive on their own; however, the disparities are significant and support the Court's conclusion that LaGrua's legitimate nondiscriminatory reasons for failing to hire Turner for the IAS position lack credence.

---

[11] In *Ash*, the Supreme Court, reversing the Eleventh Circuit, concluded that "[t]he visual image of words jumping off the page to slap you (presumably a court) in the face is unhelpful and imprecise as an elaboration of the standard for inferring pretext from superior qualifications."  *Id.* Still, it illustrates the extreme disparity in qualifications here.

Accordingly, summary judgment is denied on Turner's claim that the SoS failed to promote/hire her to the position of Investigation Area Supervisor.

### 2.    Hostile Work Environment Claim

Turner alleges that the Defendants subjected her to a gender based and racially charged hostile work environment, primarily through LaGrua's actions towards Turner. The Defendants argue that Turner cannot establish a prima facie case for a hostile work environment claim.

To establish a prima facie case for a hostile work environment claim, a plaintiff must prove that (1) she is a member of a protected group; (2) she was subjected to unwelcome harassment; (3) the harassment complained of was based on her race or gender; (4) the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive work environment; and (5) there is a basis for holding the employer liable.  *Reeves v. C.H. Robinson Worldwide, Inc.*, 594 F.3d 798, 808 (11th Cir. 2010).  Specifically, when evaluating whether the harassment is sufficiently severe or pervasive, the Court looks at the totality of the circumstances and considers "(1) the frequency of the conduct; (2) the severity of the conduct; (3) whether the conduct is physically threatening or humiliating, or a mere offensive utterance; and (4) whether the conduct unreasonably interferes with the employee's job performance."  *Freeman v. City of Riverdale*, 330 F. App'x 863, 865 (11th Cir. 2009).[12]  It is not sufficient to merely highlight a couple of utterances, even a couple of racial slurs, as evidence of a hostile work environment; instead, the workplace

---

[12] "Unpublished opinions are not considered binding precedent, but they may be cited as persuasive authority."  11th Cir. R. 36-2.

must be "permeated with discriminatory intimidation, ridicule, and insult." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993).

Here, the Defendants argue that there is no evidence that LaGrua's comments and conduct towards Turner were based on her race and gender.  Further, they assert that the harassment, if based on race or gender, was not sufficiently severe or pervasive as to alter the terms and conditions of employment.

Turner alleges LaGrua met with her almost every two weeks "to talk" and "yelled" at her every time, constantly belittled her, kept her out of meetings that affected her job duties, and refused to answer her questions.  (Doc. 31, Turner Amend. Comp. at ¶ 22).  She further contends that LaGrua again yelled at her and slammed Turner's office door shut in the presence of coworkers.  (Doc. 31, Turner Amend.  Comp. at ¶ 22).  Turner also claims that LaGrua undermined her authority by telling Turner's subordinates that "things [would] change around here when I get my new Chief" and that they should no longer follow Turner's directions.  (Doc. 31, Turner Amend. Comp. at ¶ 22).  Turner stated that LaGrua eventually stopped communicating with her completely, and that LaGrua told Turner's subordinates to report to LaGrua instead of Turner.  (Doc. 20-3, Turner Aff.  at ¶¶ 41, 42).  Turner alleges that LaGrua also denied her access to POST training that she needed.

While the conduct and statements alleged by Turner were disrespectful, unprofessional and harassing, they do not create an environment "permeated with discriminatory intimidation, ridicule, and insult" as required to establish a prima facie case under Title VII for hostile work environment.  Turner does not allege that LaGrua made any comments towards her based on her gender or race, nor is there evidence

that LaGrua made any gender or race based comments during any of her interactions with Turner.  (Doc. 18-18, Turner Dep. at 55).   Accordingly, because Turner fails to establish a prima facie case of workplace harassment, summary judgment in favor of the SoS is appropriate on Turner's Title VII hostile work environment claim.

### 3.    Constructive Discharge Claim

Turner also alleges that she was forced to resign based upon intolerable work conditions created by LaGrua.  To establish constructive discharge, Turner must prove that working conditions were "so intolerable that a reasonable person in [her] position would have been compelled to resign." *Griffen v. GTE Florida, Inc.* 182 F.3d 1279, 1283 (11th Cir. 1999).  This standard is so high that the plaintiff "must demonstrate a greater severity or pervasiveness of harassment than the minimum requirement to prove a hostile working environment."  *Hipp v. Liberty National Life Insurance Co.,* 252 F.3d 1208, 1231 (11th Cir. 2001).

As discussed above, Turner has not offered sufficient evidence to demonstrate a workplace environment "so intolerable that a reasonable person in [her] position would have been compelled to resign."  Again, LaGrua's alleged conduct and statements may have been disrespectful, unprofessional, and harassing; however, this alleged behavior does not rise to the level necessary to establish constructive discharge.  Accordingly, because Turner fails to create an issue of fact regarding her constructive discharge claim, summary judgment in favor of the SoS is appropriate on Turner's Title VII constructive discharge claim.

### 4.    Retaliation Claim

Turner alleges that the Defendants retaliated against her because she filed an internal grievance and complained of LaGrua's conduct.  The Defendants argue that Turner cannot make a prima facie case of retaliation.

Under Title VII, an employer may not retaliate against an employee because the employee "has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter."  42 U.S.C. § 2000e-3(a).  To establish a prima face case of retaliation, a plaintiff must show that (1) she engaged in statutorily protected expression; (2) she suffered an adverse employment action; and (3) the adverse action was causally related to the protected expression.  *Cotton v. Cracker Barrel Old Country Store, Inc.*, 434 F.3d 1227, 1233 (11th Cir. 2006).  If a plaintiff makes out a prima facie case of retaliation, the burden shifts to the employer to articulate legitimate reasons for the adverse employment action, and, if the employer does so, a plaintiff has the ultimate burden of showing by a preponderance of the evidence that the employer's reasons were pretextual.  *Holifield v. Reno*, 115 F.3d 1555, 1564-66 (11th Cir. 1997).

An employee's speech regarding unfair employment practices is statutorily protected speech if the employment practice is made unlawful by Title VII.  *See Clover v. Total Sys. Servs., Inc.*, 176 F.3d 1346 (11th Cir. 1999).  However, to constitute protected speech a plaintiff must have a "good faith, reasonable belief that her employer has engaged in unlawful discrimination."  *Id.* at 1351.  Thus, a plaintiff's complaint of "unfair treatment, absent discrimination based on race, sex, or national original, is not

an unlawful practice under Title VII" and is not protected speech for purposes of Title VII retaliation claims. *See Coutu v. Martin County Bd. of County Commissioners*, 47 F.3d 1068, 1074 (11th Cir. 1995).[13]

Here, the Defendants argue that Turner cannot make out a prima facie case for retaliation because her grievance is not protected speech and there is no causal connection between Turner's grievance and the termination of her position. The Court agrees. Turner's grievance is not statutorily protected speech because she did not allege in her grievance unfair treatment based on race, gender, or national origin discrimination. Nothing in her unofficial or official grievance alleges that LaGrua or anyone within the SoS was discriminating against her in a manner made unlawful by Title VII.

Accordingly, Turner fails to establish the first prong of the prima facie case for retaliation, and the claim fails as a matter of law. Thus, the SoS is entitled to summary judgment on Turner's Title VII retaliation claim.

### 5. Disparate Treatment Claim

Although Turner does not clearly articulate a disparate treatment claim, she does allege that LaGrua treated her differently than white employees. (Doc. 31, Turner Amend. Comp. at ¶¶ 16, 17, 18). Further, the Defendants specifically address the claim in their Motion.

In order to establish a prima facie case of disparate treatment, a plaintiff must establish (1) she belongs to a protected class; (2) she was subjected to an adverse

---

[13] The Court cannot consider conduct that may have been opposed by Turner, but was not complained of. The only conduct the Court will consider is conduct that the Turner actually complained of, not conduct that may have occurred or that later came to light. *Clover*, 176 F.3d at 1351; *Higgins v. New Balance Athletic Shoes, Inc.* 194 F.3d 252, 262 (1st Cir. 1999).

employment action; (3) her employer treated similarly situated people outside of the protected class more favorably; and (4) she was qualified to do the job.  *McCann v. Tillman,* 526 F.3d 1370, 1373 (11th Cir. 2008) (internal citations and quotations omitted).  If the plaintiff is successful, the burden shifts to the defendant to articulate a legitimate nondiscriminatory reason for the adverse employment action.  *Id.*  If it does, then the plaintiff must show the reason proffered by the defendant is a pretext for unlawful discrimination.  *Id.*

Here, there is no dispute that Turner satisfies the first and fourth prongs of a prima facie case.  Therefore, in determining whether a genuine issue of material fact exists, the Court must look to whether Turner suffered an adverse employment action and, if so, whether a similarly situated non-protected employee was treated more favorable.

To establish an adverse employment action, "an employee must show a serious material change in the terms, conditions or privileges of employment … as viewed by a reasonable person in the circumstance."  *Davis v. Town of Lake Park*, 245 F.3d 1232, 1239 (11th Cir. 2001).  Turner alleges several potentially adverse actions.  First, she alleges LaGrua denied her access to training that Munday had already approved.  Second, she alleges that LaGrua questioned her leave time without questioning the leave time of other white employers.  Third, she alleges that no white employees lost their job, nor were any demoted as a result of the reorganization.  (Doc. 31, Turner Amend. Comp. at ¶ 19).

First, courts have concluded that verbal criticism, unfair comments, and being yelled at are not considered adverse employment actions for the purposes of disparate

treatment analysis.  *Givens v. Chambers*, 548 F. Supp. 2d 1259, 1271 (M.D. Ala. 2008);

*Smalls v. Allstate Ins. Co.*, 396 F. Supp. 2d 364, 371 (S.D.N.Y. 2005).  Moreover, the

failure to allow an employer to attend training classes does not constitute an adverse

employment action.  *Melton v. National Dairy, LLC*, 705 F. Supp. 2d 1303, 1338 (M.D.

Ala. 2010).  Thus, two of Turner's complaints—the denial of leave and denial of access

to training—do not rise to the level of adverse employment action required to sustain a

prima facie case.  *See Davis*, 245 F.3d at 1238 ("[N]ot all conduct by an employer

negatively affecting an employee constitutes [an] adverse employment action.").

Turner's remaining allegation, that her job was eliminated as a result of the

reorganization while no white employee's jobs were, does constitute an adverse

employment action for purposes of this analysis.  However, Turner fails to identify a

similarly situated employee outside her protected class that was treated more favorably.

It is Turner's burden to identify an employee that is "similarly situated in all relevant

respects...."  *Knight v. Baptist Hosp. of Miami*, 330 F.3d 1313, 1316 (11th Cir. 2003).

Turner fails to, and, in fact, does not even attempt to identify another SoS employee

who was "similarly situated in all relevant aspects" as she, but treated more favorably.  It

seems that Turner's eliminated job, Director of Investigators/Deputy Director of

Enforcement, was the only such position within the PLB.  As such, her disparate

treatment claim fails as a matter of law, and summary judgment is granted in favor of

the SoS.

## IV. Conclusion

Accordingly, the Defendants' Motion for Summary Judgment is granted in part

and denied in part.  Summary judgment is **GRANTED** as to all claims asserted against

Defendant Shawn LaGrua, in her individual capacity.  Next, with regard to Turner's

failure to promote to Deputy Inspector General based on race and/or gender claim

against Defendant Georgia Secretary of State, an issue of material fact exists, therefore

summary judgment is **DENIED**.  Further, with regard to Turner's failure to promote/hire

to Investigator Area Supervisor based on race and/or gender claim against Defendant

Georgia Secretary of State, summary judgment is **DENIED**.  As to the remainder of the

Turner's Title VII claims asserted against the SoS, summary judgment is **GRANTED**.


    **SO ORDERED**, this the 30th day of January, 2012.


            S/ Marc T. Treadwell
            MARC T. TREADWELL, JUDGE
            UNITED STATES DISTRICT COURT